# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DASON MUSICK,**

                  **Plaintiff**,

v.

**PRAIRIE BAND POTAWATOMI
NATION, et al.,**

                  **Defendants**.

**Case No. 24-2299-DDC-TJJ**

## MEMORANDUM AND ORDER

Plaintiff Dason Musick's night at the casino quickly escalated, landing him in the Jackson County (, Kansas) Jail for (among other charges) driving while intoxicated. Jackson County eventually dropped the proceedings against plaintiff, who then filed this federal-question action. Plaintiff alleges that defendant Prairie Band Potawatomi Nation ("the Tribe") violated multiple provisions of the Kansas Tort Claims Act. Plaintiff also asserts claims against several of the Tribe's law enforcement officers—defendants Officer Tanner Lemery, Officer Derek Tuck, and Chief of Police Terry Clark (collectively, "the Tribal officers"). Plaintiff asserts that these officers violated the Fourth and Fourteenth Amendments by falsely imprisoning him and delivering him to Jackson County authorities for prosecution.

This Order decides three motions: the Tribal officers' Motion for Judgment on the Pleadings (Doc. 32), the Tribe's Motion to Dismiss (Doc. 34), and plaintiff's Motion to Strike Westfall Certification (Doc. 46). The court grants in part and denies in part the Tribal Officers' Motion for Judgment on the Pleadings (Doc. 32); grants the Tribe's Motion to Dismiss (Doc.

34); and denies as moot plaintiff's Motion to Strike Westfall Certification (Doc. 46).  This Order explains these conclusions, starting with the Complaint's background allegations.

## I.    Background[1]

The following facts come from plaintiff's Complaint (Doc. 1).  The court accepts plaintiff's' "well-pleaded facts as true, view[s] them in the light most favorable to Plaintiff[], and draw[s] all reasonable inferences from the facts in favor of Plaintiff[]."  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted).

On April 16, 2021, plaintiff visited the Prairie Band Casino & Resort on the Tribe's reservation.  Doc. 1 at 2, 3 (Compl. ¶¶ 9, 19).  While he was gambling, Tribal police officers Tanner Lemery and Derek Tuck approached him and directed that he leave the casino immediately.  *Id*. at 2, 3 (Compl. ¶¶ 3–4, 19).  The officers informed plaintiff that they thought he was too intoxicated to drive and he'd need to find another way home.  *Id*. at 3 (Compl. ¶ 19).  Because plaintiff lived too far from the casino to walk, he tried to drive.  *Id*. at 3–4 (Compl. ¶ 19).  Officers Lemery and Tuck pulled him over before he left the casino's parking lot.  *Id*. at 4 (Compl. ¶ 20).

The officers administered two preliminary breath tests, but neither indicated that plaintiff's blood alcohol content exceeded the legal limit.  *Id*.  Still, the officers handcuffed plaintiff and transported him to the Tribe's police station in Mayetta, Kansas, just outside the reservation.  *Id*. at 3, 4 (Compl. ¶¶ 18, 21).  There, the officers administered two more breathalyzer tests.  *Id.* at 4 (Compl. ¶ 24).  The officers claimed the second sample exceeded the legal limit.  *Id*.  But the officers knew that the breathalyzer at the Tribe's police "station was

---

[1]    The court confines its discussion here to facts pertinent to the claims against the Tribal Officers and the Tribe.  For a further discussion of the factual background of plaintiff's suit, see Doc. 59, the court's earlier Memorandum and Order.

producing false results." *Id.* (Compl. ¶ 25).  In fact, at a later suppression hearing, Officer

Lemery testified that he knew the station's breathalyzer was faulty, and that it was yielding false

positives around the time he and Officer Tuck tested plaintiff.  *Id*. at 4, 5 (Compl. ¶¶ 25, 31).

Still, the officers transported plaintiff to the Jackson County Jail.  *Id.* at 5 (Compl. ¶ 29).  They

filed an affidavit supporting charges against plaintiff for driving under the influence, disorderly

conduct, and criminal trespass.  *Id*.  Plaintiff characterizes the affidavit as "knowingly false."  *Id.*

    During plaintiff's prosecution in Kansas state court, the Tribal Police Chief Terry Clark

attempted to testify unlawfully at an administrative hearing.  *Id.* (Compl. ¶ 30) (alleging Clark's

attempted testimony violated Kan. Stat. Ann. § 8-1020(g)).  What's more, Chief Clark "initiated

*ex parte* contact with [Kansas state court] Magistrate Campbell, who was presiding over the

prosecution of [plaintiff], in an attempt to influence the outcome against [him]."  *Id*. (Compl.

¶ 33).  Magistrate Campbell recused, and the state court District Judge suppressed the faulty

breathalyzer evidence.  *Id*. (Compl. ¶¶ 34–35).  By 2023, Jackson County had dismissed all

charges against plaintiff.  *Id*. at 6 (Compl. ¶ 36).

    The court next addresses the governing standard for defendants' motions.

## II.    Legal Standard

    Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state

a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive

a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S.

at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)). The Tenth Circuit has explained that "[t]here is a 'low bar for surviving a motion to dismiss[.]'" *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)). "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely[.]'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quoting *Quintana*, 973 F.3d at 1034).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).[2]

The court now turns to defendants' motions, starting with the Tribal officers' Motion for Judgment on the Pleadings (Doc. 32).

---

[2] As other courts have recognized, it's not altogether clear whether Rule 12(b)(6)'s standard also applies to dismissal arguments based on tribal exhaustion. *See World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp.*, 362 F. Supp. 3d 1021, 1087–88, 1088 n.25 (D.N.M. 2019) (compiling Tenth Circuit cases and opining the "cases on exhaustion provide little guidance as to whether motions to dismiss for failure to exhaust may be treated as 12(b)(6) motions"). In the end, even under a favorable 12(b)(6) standard, plaintiff can't elude the Tribe's exhaustion argument. The court thus assumes—without deciding—that the 12(b)(6) standard governs the Tribe's exhaustion arguments. *See id.* at 1091 (concluding that 12(b)(6) is appropriate standard for evaluating exhaustion argument).

III.        **Tribal Officers' Motion to Dismiss (Doc. 32)**

This section proceeds as follows.  To start, the court addresses a procedural issue with the officers' motion.  Then, the court takes up the substance of the motion, starting with plaintiff's unlawful-detention claim before moving to the claims for malicious prosecution and conspiracy.

A.        **Procedural Defect**

The Tribal officers improperly moved for judgment on the pleadings.  *See* Fed. R. Civ. P. 12(c) (allowing motion "[a]fter the pleadings are closed").  That's so because the Tribal officers filed their 12(c) motion before the pleadings closed.  *See Santa Fe All. For Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 809 n.3 (10th Cir. 2021) ("The pleadings are not closed until all defendants have filed an answer." (quotation cleaned up)).  Here, the Tribal officers moved for judgment on the pleadings after they filed *their* answer.  *See* Doc. 32; Doc. 31 (Tribal officers' Answer).  But the Tribe itself hadn't yet filed an answer.  So, the pleadings weren't closed when the officers filed their motion.  Indeed, the pleadings still aren't closed.  This makes a Rule 12(c) motion inappropriate.

Still, the court exercises its discretion and construes defendants' Motion for Judgment on the Pleadings as a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).  It does so for three reasons. *One*, the same standard applies to defendants' motion whether the court treats it as one seeking judgment on the pleadings or as one seeking to dismiss those claims.  *Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1160 (10th Cir. 2000) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).").  *Two*, addressing the substance of defendants' motion now will serve the interests advanced by Fed. R. Civ. P. 1—the "just speed, an inexpensive determination of every action and proceeding."  *See also* Doc. 59 at 2–3 (treating procedural defect in sheriff defendants' 12(c) motion similarly); *Van Horn v. Salvation Army*, No. 23-2009-DDC-ADM, 2024 WL 1256245, at *10–11 (D. Kan. Mar. 25,

2024) (reaching same pleading closure conclusion). *Three*, that the Tribe hasn't yet filed an answer won't affect pleading closure on the claims against the Tribal officers. *See Van Horn*, 2024 WL 1256245, at *11.

Having eliminated that procedural wrinkle, the court now turns to the substance of the Tribal officers' motion and plaintiff's Complaint, starting with plaintiff's unlawful-detention claim.

### B.    Unlawful-Detention Claim

Count IV of the Complaint asserts two § 1983 causes of action against the Tribal officers: malicious prosecution and unlawful pretrial detention. Doc. 1 at 9 (Compl. Count IV). As best the court can discern, the unlawful-detention claim alleges that the Tribal officers illegally arrested plaintiff while the malicious-prosecution claim alleges that the Tribal officers caused plaintiff's subsequent prosecution in Kansas state court. *See* Doc. 1 at 9–11 (Compl. ¶¶ 63–75); *see also Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (explaining that "[w]hat separates" a false-imprisonment claim and a malicious-prosecution claim is "the institution of legal process"). The court now addresses the Tribal officers' arguments against plaintiff's unlawful-detention claim.

The Tribal officers argue that any claim of unlawful detention (or false arrest) fails because plaintiff filed suit after the statute of limitations had expired. Doc. 33 at 4–6. Plaintiff wholly fails to respond to this argument—permitting the court to dismiss this claim on procedural grounds. *See generally* Doc. 43. But even if plaintiff had responded, the substance of the Tribal officers' argument still has merit. The court thus dismisses plaintiff's unlawful-detention claim because it fails on both procedural and substantive grounds.

Start with procedure. Our Circuit hasn't decided whether "failure to address an argument in response to a motion to dismiss categorically constitutes abandonment or requires a court to

deem claims abandoned." *Brown v. Nationwide Ins. Co.*, No. 21-4122, 2023 WL 4174064, at *9 n.9 (10th Cir. June 26, 2023). But it has affirmed dismissal of a claim "'when a party fails to develop arguments related to a discrete issue or when a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss[.]'" *Id.* at *9 (quoting *Lee v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 912 F.3d 1049, 1053–54 (7th Cir. 2019)); *see also C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270, 1282 (10th Cir. 2022) ("The district court correctly dismissed Plaintiff's facial challenge here because he abandoned it by not addressing it in his response to Defendants' motion to dismiss."). Given this Circuit authority, the court considers plaintiff's § 1983 unlawful-detention claim against the Tribal officers abandoned. *See Cortishae-Eier v. Ford Motor Co.*, No. 23-3081-EFM-TJJ, 2023 WL 5625311, at *3 (D. Kan. Aug. 31, 2023) (finding plaintiff abandoned some claims by "failing to substantively respond" on motion to dismiss).

The court would reach the same conclusion based on the substance of the Tribal officers' argument. In § 1983 actions, the "statute of limitations is drawn from the personal-injury statute of the state in which the federal district court sits." *Mondragón v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). In Kansas, the statute of limitations for personal-injury claims is two years. Kan. Stat. Ann. § 60-513(a)(4); *see also Eikenberry v. Seward County*, 734 F. App'x 572, 575 (10th Cir. 2018) (applying two-year Kansas statute of limitations to § 1983 claim). Plaintiff's detention ended on April 17, 2021.[3] So, the statute-of-limitations clock started to run

---

[3] The Complaint doesn't allege when plaintiff's detention ended. *See generally* Doc. 1. The Tribal officers assert that they attached a surety bond to their Response, Doc. 33 at 3 n.3, but the docket doesn't show any attachment to their Response. Still, the court independently may take judicial notice of the state-court documents that support this fact. *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (explaining that courts may take judicial notice of "publicly-filed records in . . . other courts concerning matters that bear directly upon the disposition of the case at hand"); *Kansas v. Musick*, No. 2021-CR-000253, Doc. 1 at 1 (Jackson Cnty. Dist. Ct. Apr. 19, 2021) (surety bond for plaintiff's release, signed on April 17, 2021).

that day. *See Mondragón*, 519 F.3d at 1082 ("The statute of limitations for a Fourth Amendment claim for false arrest or imprisonment begins to run when the alleged false imprisonment ends." (quotation cleaned up)). Plaintiff filed his Complaint on July 10, 2024, more than three years after his detention ended. Doc. 1. Three-plus years is longer than two years, so the statute-of-limitations defense bars the unlawful-detention claim.

The court takes up plaintiff's malicious-prosecution claim, next.

### C.    Malicious-Prosecution Claim

The Tribal officers raise the defense of qualified immunity against plaintiff's malicious-prosecution claim. Doc. 33 at 6–12. The court starts its discussion by outlining the broad contours of the defense before analyzing the substance of plaintiff's claim here.

#### 1.    Law on Qualified Immunity

"When a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the [1] defendant[] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time.'" *Brown*, 124 F.4th at 1265 (alterations in original) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)). That's so because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed." *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional

violation and that that violation was clearly established.").  If plaintiff fails to carry that burden,

"'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed."  *Losee v.*

*Preece*, No. 18-CV-195-TC, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v.*

*Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

　　　A constitutional right is clearly established when, "at the time of the officer's conduct,

the law was sufficiently clear that every reasonable official would understand that what he is

doing is unlawful.  In other words, existing law must have placed the constitutionality of the

officer's conduct beyond debate."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)

(internal quotation marks and citations omitted).  A plaintiff can't defeat qualified immunity

"simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79

(2017), and a court shouldn't "define clearly established law at a high level of generality,"

*Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

　　　One final point about the procedural posture of this the Tribal officers' motion is in order.

And here, it's a significant point.  Raising qualified immunity in a motion to dismiss subjects the

Tribal officers to "a more challenging standard of review[.]"  *Thompson v. Ragland*, 23 F.4th

1252, 1256 (10th Cir. 2022) ("The procedural posture of the qualified-immunity inquiry may be

critical. . . . Asserting a qualified immunity defense via a Rule 12(b)(6) motion subjects the

defendant to a more challenging standard of review than would apply on summary judgment."

(quotation cleaned up)).

　　　The court finds that Chief Clark is qualifiedly immune from plaintiff's suit, but Officers

Lemery and Tuck are not.  The court explains why, starting with the officers.

### 2.  Analysis

　　　"A § 1983 malicious prosecution claim includes the following elements:  (1) the

defendant caused the plaintiff's continued confinement or prosecution; (2) the original action

terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued

confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained

damages." *Sanchez v. Hartley*, 810 F.3d 750, 754 n.1 (10th Cir. 2016) (quotation cleaned up).

Failing to allege any of these elements adequately is fatal to plaintiff's claim. *See Carbajal v.

Watada*, No. 21-1370, 2024 WL 3887252, at *3 n.3 (10th Cir. Aug. 21, 2024) ("Qualified

immunity is appropriately granted if [plaintiff] fail[s] to satisfy *any* of the five elements . . . of a

§ 1983 malicious-prosecution claim." (emphasis in original)). The Tribal officers allege that

plaintiff's claim fails on the first prong of qualified immunity because he hasn't alleged that any

of them caused his prosecution. Doc. 33 at 9–11.[4]

### a.    Officers Lemery and Tuck

At this stage, plaintiff has shouldered his burden on both prongs of the qualified-

immunity inquiry governing the claims against Officers Lemery and Tuck. Take the prongs in

turn.

Plaintiff has alleged adequately that Officers Lemery and Tuck "caused [his] continued

confinement or prosecution[.]" *Sanchez*, 810 F.3d at 754 n.1. Construed in the light most

favorable to plaintiff, the Complaint alleges that Officers Lemery and Tuck administered two

preliminary breath tests, which plaintiff "passed by a wide margin[.]" Doc. 1 at 4 (Compl. ¶ 20).

They then transported him to the Tribe's police station, where they administered two more tests.

*Id.* (Compl. ¶¶ 21, 24). One of these tests showed that plaintiff wasn't intoxicated, and one of

them showed that he was. *See id.* (Compl. ¶ 24). But critically, the officers "had known for

---

[4]       The Tribal officers also argue that plaintiff's allegations that they violated Kansas law are
irrelevant to plaintiff's § 1983 claims. Doc. 33 at 8–9. Plaintiff doesn't respond to this argument. *See
generally* Doc. 43. Regardless, the court agrees with the Tribal officers. State-law violations aren't
relevant to § 1983 claims. *See Jones v. City and County of Denver*, 854 F.2d 1206, 1209 (10th Cir. 1988)
("Section 1983 does not . . . provide a basis for redressing violations of *state* law, but only for those
violations of *federal* law done under color of state law." (emphasis in original)).

some time that the breathalyzer at the [Tribe's] station was producing false results." *Id.* (Compl. ¶ 25); *see also id.* (Compl. ¶ 24).  Officers Lemery and Tuck then transported plaintiff "to the Jackson County Jail and filed a knowingly false affidavit to charge him with driving under the influence, disorderly conduct, and criminal trespass." *Id.* at 5 (Compl. ¶ 29).  The Jackson County Prosecutor then pursued criminal charges against plaintiff, presumably based on the officers' affidavit. *See id.* at 5, 6 (Compl. ¶¶ 29, 37).

These allegations sufficiently provide an "affirmative link" between the officers' conduct and the plaintiff's subsequent prosecution. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).  Plaintiff "may demonstrate causation by showing an affirmative link between the constitutional deprivation and the officer's exercise of control or direction." *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010).  Plaintiff has pleaded facts capable—if true—of supporting the requisite causal connection.  But for the officers submitting a false affidavit and transporting plaintiff to the Jackson County Jail, the Jackson County Prosecutor wouldn't have filed charges against plaintiff.

Officer Lemery argues that plaintiff never alleges that Officer Lemery subjectively "thought that the breathalyzer produced a false result" for plaintiff's breath sample.  Doc. 33 at 11.  The court disagrees.  Viewed in the light most favorable to plaintiff, plaintiff has alleged that Officer Lemery "admitted" that the breathalyzer machine "was producing false results."  Doc. 1 at 4 (Compl. ¶ 24).  It's thus reasonable to infer that Officer Lemery was aware that a faulty machine produced a faulty result when he used it to test plaintiff's breath sample.  So when Officer Lemery signed an affidavit that attested to the accuracy of that breath sample, he "knowingly or recklessly use[d] false information to institute legal process." *Sanchez*, 810 F.3d at 754.  Had Officer Lemery truthfully conveyed the totality of the circumstances in his

affidavit—that multiple breath tests returned negative and that the positive reading came from a faulty machine—probable cause to charge plaintiff wouldn't have existed. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) ("In a case involving the withholding of exculpatory evidence, the existence of probable cause is determined by examining the evidence as if the omitted information had been included and inquiring whether probable cause existed in light of all the evidence, including the omitted information." (quotation cleaned up)); *McCarty v. Gilchrist*, 646 F.3d 1281, 1286 (10th Cir. 2011) ("Probable cause exists if the facts and circumstances are sufficient to warrant a person of reasonable caution to believe a crime has been committed."). The court thus rejects Officer Lemery's causation argument. Plaintiff has sufficiently alleged a causal link between Officer Lemery's conduct and plaintiff's subsequent prosecution.

Officer Tuck argues that plaintiff alleges merely that he "'was aware' Officer Lemery filed an affidavit." Doc. 33 at 9 (quoting Doc. 1 at 10 (Compl. ¶ 70)). He posits that plaintiff hasn't alleged that Officer Tuck had any involvement in preparing the affidavit, or that he was even aware of the contents of the affidavit. *Id.* The court disagrees with this characterization. True, paragraph 70 of the Complaint says that Officer Lemery filed a false affidavit and that Officer Tuck "was aware" of that filing. Doc. 1 at 10 (Compl. ¶ 70). But another part of the Complaint alleges that the officers collectively filed the falsified affidavit. Doc. 1 at 5 (Compl. ¶ 29) (alleging that Officer Lemery and Officer Tuck "transported [plaintiff] to the Jackson County Jail and filed a knowingly false affidavit to charge him with driving under the influence"). Taken together and drawing all reasonable inferences to favor plaintiff, the Complaint alleges that Officer Tuck was more than a passive bystander. He actively assisted detaining plaintiff, administering the blood-alcohol testing, and transporting him to the Jackson County Jail. *See id.*

at 4, 5 (Compl. ¶¶ 20, 24, 25, 29).  In other words, Officer Tuck helped "initiate legal process" against plaintiff by transporting him to jail based on an affidavit he knew was false.  *Sanchez*, 810 F.3d at 759.  As an active and knowing participant in arresting plaintiff and delivering him to authorities, Office Tuck bears responsibility for "set[ting] in motion a series of events" causing "others to deprive the plaintiff of [his] constitutional rights."  *Mink*, 613 F.3d at 1001 (internal quotation marks and citation omitted).  Officer Tuck can't escape liability just because he didn't sign the affidavit.  *Cf. Sanchez*, 810 F.3d at 758 (holding that "four detectives and investigator"—even though they didn't file a false affidavit or make prosecuting decision— "would incur liability under a malicious prosecution theory if they knowingly or recklessly used false information to institute legal process").[5]

That conclusion takes care of prong one of the qualified-immunity inquiry.  Plaintiff adequately has alleged that Officers Lemery and Tuck violated his constitutional rights.  The court now turns to the second prong, whether those allegedly violated rights "were clearly established at the time."  *Brown*, 124 F.4th at 1265 (internal quotation marks and citation omitted).

They were.  It is clearly established that "the deliberate or reckless falsification or omission of evidence [is] a constitutional violation[.]"  *Pierce*, 359 F.3d at 1299; *Sanchez*, 810 F.3d at 760 (explaining that it is a constitutional violation "to knowingly or recklessly use false information to initiate legal process"); *Bledsoe*, 53 F.4th at 612 ("This court has recognized the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the

---

[5]    Plaintiff's briefing on these points isn't particularly helpful.  *See* Doc. 43 at 3–4.  Copy-and-pasting long segments of the Complaint doesn't help the court make sense of the parties' arguments.  The court already has access to the pleadings.  Nonetheless, the court concludes plaintiff has done enough to shoulder his burden to allege that Officer Tuck violated plaintiff's constitutional rights.

truth, was firmly established as of 1986." (quotation cleaned up)).  As alleged, Officer Lemery—

with Officer Tuck's help—delivered plaintiff to authorities and submitted an affidavit with

knowingly false information.  Those allegations—if true—violated clearly established law.

In malicious-prosecution cases, our Circuit also has framed the qualified-immunity

question as turning on "whether there was arguable probable cause for the challenged conduct."

*Bledsoe v. Carreno*, 53 F.4th 589, 615 (10th Cir. 2022) (quotation cleaned up).  "Arguable

probable cause is another way of saying that the officers' conclusions rest on an objectively

reasonable, even if mistaken, belief that probable cause exists."  *Id.* (quotation cleaned up).  No

reasonable officer in Officer Lemery and Officer Tuck's shoes could have thought probable

cause to arrest plaintiff for driving while intoxicated existed when three tests showed that he

wasn't intoxicated.  And the only evidence of intoxication came from a faulty machine.  The

officers thus don't deserve qualified immunity under this formulation of the test either.

The officers also argue that plaintiff can't point to any case "holding that an officer

cannot . . . rel[y] on breathalyzer results from a machine that has—at times—malfunctioned."

Doc. 33 at 12; *see also* Doc. 49 at 4 n.2 ("[Plaintiff] fails to identify any case holding . . . an

officer violates the Constitution by accurately reporting breathalyzer results in arrest materials

when the officer knows the machine has produced false positives in the past.").  This framing of

the Complaint drastically understates what it alleges.  Far from suggesting an occasional

malfunction, the Complaint avers that the breathalyzer machine at the Tribe's station "was

producing false results."  Doc. 1 at 4 (Compl. ¶¶ 24, 25).  Viewing this allegation in the light

most favorable to plaintiff, the breathalyzer was broken, consistently yielding inaccurate results.

*See id.*  Plus, the officers knew that three of the four tests they had administered returned

negative results, heightening the likelihood that the positive from the faulty machine was a false one.

As alleged, the officers violated clearly established law when they transported plaintiff to authorities for arrest based on a false result, and by signing an affidavit that omitted critical context for the positive result. Officer Lemery and Officer Tuck thus don't deserve qualified immunity on plaintiff's malicious-prosecution claim—at least at this stage of these proceedings.

The court takes up Chief Clark's qualified-immunity arguments, next.

### b.    Chief Clark

Chief Clark didn't cause plaintiff's constitutional injury. Plaintiff's claim against Chief Clark can't overcome the first prong of qualified immunity. So, the court dismisses it.

Plaintiff never alleges that Chief Clark had any direct involvement in arresting him or delivering him to authorities. *See generally* Doc. 1. And Chief Clark isn't liable just because he generally supervises Officer Lemery and Officer Tuck. *See Gallagher*, 587 F.3d at 1069 ("Supervisory status alone does not create § 1983 liability.").

Plaintiff includes just two allegations about Chief Clark, neither of which subjects him to liability. *First*, plaintiff alleges that "Chief Clark attempted to illegally testify during [plaintiff's] administrati[ve] hearing," in violation of a Kansas statute. Doc. 1 at 10 (Compl. ¶ 71). Plaintiff alleges nothing more about this event. Nor does plaintiff ever allege or explain how an *attempt* to testify at an administrative hearing "caused the plaintiff's continued confinement or prosecution[.]" *Sanchez*, 810 F.3d at 754 n.1. Neither plaintiff's Complaint nor his response brief explains the relationship between Chief Clark's attempted testimony at a civil proceeding and plaintiff's criminal prosecution. Without more, this allegation can't support a malicious-prosecution claim against Chief Clark.

15

*Second*, plaintiff alleges that "Chief Clark initiated *ex parte* contact" with the state court magistrate "who was presiding over" plaintiff's prosecution. Doc. 1 at 10 (Compl. ¶ 72); *id.* at 5 (Compl. ¶ 33). According to plaintiff, Chief Clark did so in an attempt to influence plaintiff's criminal proceeding. *Id.* The magistrate then recused himself. *Id.* at 5 (Compl. ¶ 34). If that allegation is true, Chief Clark's actions were imprudent. But once more, plaintiff hasn't carried his burden to allege facts explaining how Chief Clark's misguided effort caused plaintiff's prosecution. *See Sanchez*, 810 F.3d at 754 n.1. Without them, plaintiff's claim based on this communication attempt falls flat.

Plaintiff's Complaint offers no other allegation against Chief Clark. And plaintiff's response brief wholly ignores Chief Clark's causation arguments. *See generally* Doc. 43. No "affirmative link" connects Chief Clark to plaintiff's prosecution. *Mink*, 613 F.3d at 1001. Chief Clark thus deserves qualified immunity because plaintiff hasn't shouldered his burden to allege facts capable of supporting a finding that Chief Clark violated his constitutional rights.

The court takes up plaintiff's conspiracy allegation, next.

### D.    Conspiracy Claim

Plaintiff also asserts a conspiracy theory against the Tribal officers. Doc. 1 at 9 (Compl. ¶ 64). But the Complaint lacks the requisite detail to make this theory of liability viable. So, the court dismisses it. The court explains this conclusion, starting with a brief legal background about § 1983 conspiracies.

### 1.    Law on § 1983 Conspiracies

A § 1983 "'conspiracy claim allows for imputed liability[.]'" *Bledsoe*, 53 F.4th at 609 (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990)). That is, a § 1983 conspiracy theory isn't a standalone claim on which a plaintiff may recover. It requires "'an underlying constitutional deprivation'" for which "'a plaintiff may be able to impose liability on

one defendant for the actions of another performed in the course of the conspiracy.'" *Id.*

(quoting *Dixon*, 898 F.2d at 1449 n.6). To prevail on a conspiracy theory under § 1983, "a

plaintiff must show 'at least a combination of two or more persons acting in concert and an

allegation of a meeting of the minds, an agreement among the defendants, or a general

conspiratorial objective.'" *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (quoting

*Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010), *abrogated on other grounds by*

*Torres v. Madrid*, 592 U.S. 306 (2021)). The general conspiratorial objective must take the form

of "'a common, unconstitutional goal.'" *Bledsoe*, 53 F.4th at 609 (quoting *Janny v. Gamez*, 8

F.4th 883, 919 (10th Cir. 2021)); *see also Frasier*, 992 F.3d at 1025 ("[P]roof that defendants

formed an agreement or conspired to engage in lawful activities—including lawful investigative

activities—would be inadequate to support a § 1983 conspiracy claim.").

But "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983

claim.'" *Frasier*, 992 F.3d at 1024 (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504,

533 (10th Cir. 1998)). Instead, our Circuit demands specificity to plead conspiracy. "A § 1983

plaintiff must 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each

individual with fair notice as to the basis of the claims against him or her, as distinguished from

collective allegations against the state.'" *Bledsoe*, 53 F.4th at 609 (emphasis in original)

(quoting *Robbins*, 519 F.3d at 1250); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir.

1989) (affirming dismissal of conspiracy claim where "plaintiff failed to allege specific facts

showing agreement and concerted action among defendants").

## 2. Analysis

Here, plaintiff hasn't stated a viable conspiracy claim. His conspiracy allegations are no

better than conclusory. "Conclusory allegations of conspiracy . . . are insufficient to state a valid

§ 1983 claim." *Bledsoe*, 53 F.4th at 609 (quotation cleaned up). Our Circuit repeatedly and

plainly has demanded that plaintiffs "allege specific facts showing an agreement and concerted action[.]" *Tonkovich*, 159 F.3d at 533; *Brooks*, 614 F.3d at 1228 (same); *Bledsoe*, 53 F.4th at 609 (same); *Frasier*, 992 F.3d at 1024 (same). Such specific facts are wholly missing from plaintiff's Complaint. It alleges:

> Defendant PBPN Officers Lemery and Tuck and Police Chief Clark, acting in concert as co-conspirators, knowingly reached an agreement between themselves to submit false and fabricated evidence to convict Mr. Musick, including by presenting knowingly false breathalyzer results, a false affidavit, and attempting to intervene in Mr. Musick's judicial proceedings to falsely punish and convict him.

Doc. 1 at 11 (Compl. ¶ 77). A bare allegation alleging merely the fact that these defendants partook in an investigation, "however flawed it was, does not indicate a conspiracy existed." *Herbel v. City of Marion*, No. 24-cv-02224-HLT-GEB, 2024 WL 4416849 at *27 (D. Kan. Oct. 4, 2024). Without an allegation setting out *who* agreed to do *what* and *when* and *how* those actors formed that agreement, the Complaint fails to set out a plausible conspiracy theory. *Cf. Twombly*, 550 U.S. at 565 n.10 (suggesting conspiracy claim failed where complaint alleged "no specific time, place, or person involved").

What's more, plaintiff's Response to the motion does little to clarify his allegations. Plaintiff argues the Complaint alleges that the Tribal officers "acted together[.]" Doc. 43 at 5. But that allegation doesn't suggest an *agreement*, the keystone element of a conspiracy theory. *See Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004) ("Parallel action . . . does not necessarily indicate an agreement to act in concert."). Plaintiff then—yet again—reproduces a significant section of his Complaint. Doc. 43 at 4–6. But rehashing what the court already has before it is unavailing. With no further explanation or factual support, plaintiff's conspiracy theory is too conclusory to survive defendants' Motion to Dismiss. The court thus dismisses it.

### E.     Conclusion – Tribal Officers' Motion to Dismiss

Plaintiff abandoned his untimely unlawful-detention claim. So, the court dismisses it. Likewise, Chief Clark deserves qualified immunity on plaintiff's malicious-prosecution claim. And plaintiff's conspiracy allegations are too specious to overcome the plausibility hurdle. The court thus dismisses those claims. Other than the untimely unlawful-detention claim, these dismissals are without prejudice. *See Seale v. Peacock*, 32 F.4th 1011, 1029 (10th Cir. 2022) (suggesting that dismissal with prejudice is appropriate only when "it is patently obvious" that amendment couldn't cure pleading's defects (quotation cleaned up)). But plaintiff's malicious-prosecution claims against Officer Lemery and Officer Tuck survive this Order. The court thus grants in part and denies in part the Tribal officers' Motion for Judgment on the Pleadings, Construed as a Motion to Dismiss (Doc. 32). Next, the court takes up the Tribe's Motion to Dismiss (Doc. 34).

## IV.     Tribe's Motion to Dismiss (Doc. 34)

The Tribe argues that plaintiff's suit fails for a variety of reasons. *See* Doc. 34. In the end, the court need only address one—exhaustion of tribal remedies. The court explains this conclusion, below. First, however, the court offers its rationale for bypassing the Tribe's arguments about subject matter jurisdiction.

### A.  Order of Operations

Before jumping to the tribal-exhaustion argument, the court pauses to ensure that it properly may bypass the Tribe's sovereign-immunity argument—an argument that implicates the court's subject matter jurisdiction. The "Supreme Court has instructed that federal courts may not assume they have subject matter jurisdiction for the purpose of deciding claims on the merits." *Valenzuela v. Silversmith*, 699 F.3d 1199, 1204–05 (10th Cir. 2012) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). Still, "a federal court has leeway to

19

choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotation marks and citation omitted).  So, the court "may choose to avoid difficult subject matter jurisdiction questions and dispose of a case on a 'threshold, nonmerits issue,' such as *forum non conveniens* grounds, so long as resolving the issue 'does not entail any assumption by the court of substantive law-declaring power.'"  *Valenzuela*, 699 F.3d at 1205 (quoting *Sinochem Int'l Co.*, 549 U.S. at 433, 436); *see also Sinchem Int'l Co.*, 549 U.S. at 431 ("Jurisdiction is vital only if the court proposes to issue a judgment on the merits."  (quotation cleaned up)).

Our Circuit has held that failing to exhaust tribal remedies is "such a threshold, nonmerits issue[,]" which the court may address before considering subject-matter jurisdiction.  *Valenzuela*, 699 F.3d at 1205; *see also Chegup v. Ute Indian Tribe of Unitah & Ouray Rsrv.*, 28 F.4th 1051, 1060 (10th Cir. 2022) (instructing that "district court should have chosen to start with exhaustion" instead of subject-matter jurisdiction under unique circumstances of that case).  *But see World Fuel Servs.*, 362 F. Supp. 3d at 1092 ("When a party raises the defense of waiver of sovereign immunity and Tribal exhaustion in the same proceeding, the majority of Courts of Appeals generally address waiver of sovereign immunity before Tribal exhaustion.").

Here, however, the court opts for "the less burdensome" course and considers tribal exhaustion first.  *Valenzuela*, 699 F.3d at 1205 (internal quotation marks and citation omitted).  Plus, this sequencing offers the added benefit of allowing the Tribe to take the first crack at the sovereign-immunity issue.  *See Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 855–56 (1985) (explaining that "the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty[,]" which "should be conducted in the first instance in the Tribal Court itself"); *see also Chegup*, 28 F.4th at 1062 ("[T]he comity and

sovereignty concerns that motivate tribal exhaustion doctrine are at their zenith when a federal court stands in direct supervision of a tribe's sovereign actions.").

### B.    Tribal Exhaustion

The Tribe argues that the court must dismiss plaintiff's claims against the Tribe because plaintiff failed to exhaust his tribal remedies.  Doc. 35 at 9–12.  The court agrees, and it thus dismisses without prejudice plaintiff's claims against the Tribe.  The court explains, below, starting with a primer on the law governing tribal exhaustion.

### 1.    Law on Tribal Exhaustion

"When a federal court has subject-matter jurisdiction over a claim arising in Indian country over which a tribal forum has colorable jurisdiction, principles of comity and the federal policy of promoting tribal self-government generally require that the plaintiff fully exhaust tribal remedies before proceeding in federal court."  *Chegup*, 28 F.4th at 1060 (quotation cleaned up); *see also* Restatement of the Law of American Indians § 59 (A.L.I. 2022) (similar).  "This tribal exhaustion requirement is 'a "prudential rule," based on comity.'"  *Chegup*, 28 F.4th at 1060 (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997)).  The tribal-exhaustion doctrine "is grounded in federal policies supporting tribal sovereignty, including:  '(1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allowing a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary.'"  *Norton v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 862 F.3d 1236, 1242–43 (10th Cir. 2017) (quoting *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1507 (10th Cir. 1997)).  Tribal exhaustion thus "exists to preserve tribal sovereignty and prevent the federal courts from running roughshod over tribal legal systems."  *Chegup*, 28 F.4th at 1070.

The tribal exhaustion "rule applies broadly, generally covering any case in which the activity at issue arises on the reservation." *Id.* at 1060 (quotation cleaned up). Although it typically arises "where a parallel tribal court suit has already been initiated," applying the tribal-exhaustion doctrine "does not depend upon the existence of a pending action in the tribal forum." *Id.* (quotation cleaned up).

"As a prudential rule based on comity, the exhaustion rule is not without exception." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1150 (10th Cir. 2011). Relevant here, "exhaustion is not required if it is 'clear that the tribal court lacks jurisdiction,' such that 'the exhaustion requirement would serve no purpose other than delay.'" *Id.* (quoting *Burrell v. Armijo*, 456 F.3d 1159, 1168 (10th Cir. 2006)). The party invoking exceptions to the tribal-exhaustion rule—here, plaintiff—bears a "heavy burden[.]" *Chegup*, 28 F.4th at 1054.[6]

## 2.  Analysis

Recall that the Tribe needs just "colorable jurisdiction" to invoke tribal exhaustion. *Chegup*, 28 F.4th at 1060 (quotation cleaned up). The court concludes that the Tribe easily has satisfied this standard here. And plaintiff isn't close to carrying his "heavy burden" on the plainly-lacking-jurisdiction exception. *Id.* at 1054; *see also id.* at 1061 (explaining that

---

[6]    Our Circuit has recognized four other exceptions to the general exhaustion rule. *Chegup*, 28 F.4th at 1061.

> [E]xhaustion of tribal remedies is unnecessary 1) where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) where the tribal court action is patently violative of express jurisdictional prohibitions; (3) where exhaustion would be futile because of the lack of an adequate opportunity to challenge the tribal court's jurisdiction; (4) when it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by the main rule established in *Montana v. United States*, 450 U.S. 544 (1981); or (5) it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement would serve no purpose other than delay.

*Id.* (quotation cleaned up). Plaintiff just invokes the clearly-lacking-jurisdiction exception. Doc. 42 at 4. So, the court cabins its discussion to that exception.

exceptions to tribal exhaustion are "applied narrowly" and that "a party invoking any of these exceptions" must "make a substantial showing of eligibility" (quotations cleaned up)).

Start with the obvious. Plaintiff's claims arise from events on the Tribe's land. Doc. 1 at 2 (Compl. ¶ 9) ("[Plaintiff] was a guest of the [Tribe] at the Prairie Band Casino when [Tribal] police officers unlawfully, detained, arrested and transported him[.]"). And plaintiff's claims are against the Tribe itself. These attributes of plaintiff's suit—even without more—require plaintiff to exhaust tribal remedies before suing in our court. *See* Restatement of the Law of American Indians § 28 cmt. e (A.L.I. 2022) ("[L]ower courts have held that civil disputes arising out of activities of nonmembers on Indian lands almost always require exhaustion if they arise on Indian lands or involve the tribe or tribal members or citizens as defendants."). Indeed, Supreme Court precedent "'makes clear that tribal courts have exclusive jurisdiction over suits against tribal members on claims arising on the reservation.'" *Norton*, 862 F.3d at 1247 (quoting *Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 940 (9th Cir. 2009)). *See also Williams v. Lee*, 358 U.S. 217, 223 (1959) ("It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there. The cases in this Court have consistently guarded the authority of Indian governments over their reservations." (internal citations omitted)).

What's more, the Tribe's Code suggests that its jurisdiction over plaintiff's claims is proper. *See* Potawatomi Law and Order Code § 2-1-3(C). This relevant provision—in pertinent part—reads:

> All tort claims arising from injuries directly or indirectly involving or related to the Nations' gaming facilities shall be adjudicated in Tribal Court. This applies to any and all tort claims that may be brought against the Nation . . . . This subsection is expressly intended by the Nation to constitute the exclusive means of adjudication of such tort claims by patrons, invitees, guests, employees and other persons, and the Nation expressly withholds its consent to suit in any forum other than Tribal

> Court for these or any other matters. Under the Nation's Gaming Compact with
> the State of Kansas, the Nation has adopted and will apply in its Tribal Court the
> Kansas Tort Claims Act for patron claims to the extent the Act is consistent with
> federal and tribal law. . . . For claims arising from or related to the Nation's gaming
> facilities or activities, the Nation shall exercise exclusive jurisdiction for both
> Indian and non-Indians.

*Id.* Consistent with this provision, the court concludes that the Tribe's jurisdiction over

plaintiff's claims is—at very least—colorable. Plaintiff's arguments to the contrary aren't

persuasive. The court addresses those arguments, next.[7]

Plaintiff first tries to displace tribal exhaustion by arguing that the Tribe has consented to

suit in this court. Doc. 42 at 4. To be sure, "parties may waive" the tribal-exhaustion

requirement "pursuant to a forum-selection clause that eliminates the tribal forum." Restatement

of the Law of American Indians § 59 (A.L.I. 2022). But plaintiff's argument on this point is

perfunctory, consisting of a single sentence. Doc. 42 at 4. The court could reject it on that basis

alone. *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (explaining that parties

waive arguments when "they are advanced . . . only in a perfunctory manner" (quotation cleaned

---

[7]    Some of our Circuit's cases discussing the "colorable jurisdiction" principle analyze *Montana v. United States*, 450 U.S. 544—a seminal Supreme Court case, which sets out the bounds of tribal civil jurisdiction over nonmembers. *Norton*, 862 F.3d at 1243–47. The court finds that analysis unnecessary here. In *Norton*, the underlying dispute involved tribal entities suing nonmembers in tribal court. *Id.* at 1240–41. The nonmember defendants in the tribal proceeding then sued a series of tribal plaintiffs in federal court, seeking to enjoin the tribal court proceedings. *Id.* at 1241. *Norton* analyzed *Montana* in its "colorable jurisdiction" analysis because the tribe there was attempting to "hale[] a nonmember into tribal court as a defendant[.]" *Id.* at 1247. Not so here.

No one tries in this case to hale plaintiff into tribal court as a defendant. Instead, his status as plaintiff would remain constant in tribal court. As *Norton* recognized, "the party status of the nonmember is relevant. When a nonmember plaintiff sues a tribal member defendant, the suit in effect seeks to regulate the tribal member, implicating the 'right of the Indians to make their own laws and be governed by them.'" *Id.* (quotation cleaned up) (quoting *Nevada v. Hicks*, 533 U.S. 353, 361 (2001)); *see also Fine Consulting, Inc. v. Rivera*, 915 F. Supp. 2d 1212, 1224 (D.N.M. 2013) ("[T]he Supreme Court has repeatedly demonstrated its concern that tribal courts not require defendants who are not tribal members to defend themselves against ordinary claims in an unfamiliar court. No such concern about nonmember plaintiffs has been found." (quotation cleaned up)). This case law convinces the court that it needn't analyze *Montana*. Tribal exhaustion (and sovereignty) concerns are magnified when a nonmember seeks to sue a tribal entity outside of tribal courts.

up)); *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) (same). More importantly, however, the court disagrees with plaintiff's *ipse dixit* assertion that the Tribe ever consented to suit in this court. Plaintiff hasn't cited any contract or other instrument in which the Tribe consented to suit in this forum. And the Tribe's Code expressly withholds its consent to suit in any forum outside of its courts. Potawatomi Law and Order Code § 2-1-3(C) ("[T]he Nation expressly withholds its consent to suit in any forum other than Tribal Court for these or any other matters.").

Plaintiff next aims at a Kansas statute. Doc. 42 at 4 (citing Kan. Stat. Ann. § 22-2401a(b)). This statute provides that tribal officers "may exercise the powers and authority of [Kansas] law enforcement officers" if the governing tribe abides certain conditions. Kan. Stat. Ann. § 22-2401a(b)(1). The statute contains no forum-selection clause. *See generally id.* And even if it did, Kansas law can't dictate where the Tribe—a sovereign entity—consents to suit. *Cf. Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) ("Tribal immunity is a matter of federal law and is not subject to diminution by the States." (quotation cleaned up)). Plaintiff hasn't cited any authority to the contrary. Finally, plaintiff himself alleges that the Tribe has failed to satisfy the conditions outlined in Kan. Stat. Ann. § 22-2401a. Doc. 1 at 3 (Compl. ¶¶ 12–15) (alleging that the Tribe didn't file a map with the Jackson County Clerk and didn't have an appropriate insurance policy, as Kan Stat. Ann. § 22-2401a requires). So even if the statute contained a forum-selection clause, that clause—based on plaintiff's own allegations—wouldn't bind the Tribe. In short, the Tribe hasn't waived a tribal-exhaustion argument.

Plaintiff next contends that the tribe's jurisdiction is plainly lacking here. The crux of his argument is that "[t]ribal courts do not have jurisdiction to hear state law claims, such as [ones] under the Kansas Tort Claims Act." Doc. 42 at 4. The court needn't decide whether that

proposition is true as a general matter because plaintiff's suit doesn't ever assert a claim under the KTCA. To be sure, plaintiff's Complaint nominally asserts claims against the Tribe under the KTCA. Doc. 1 at 6–9 (Compl. Counts I, II, III). But Kansas has no power to subject the Tribe—a sovereign entity—to its laws. *See Bay Mills Indian Cmty.*, 572 U.S. at 788–90 (explaining that Indian tribes retain sovereign immunity, which "is a matter of federal law and not subject to diminution by the States" (quotation cleaned up)).

Instead, the reason that the Tribe is subject to the KTCA is because the Tribe has entered a Gaming Compact with Kansas, and in that Gaming Compact the Tribe has agreed to adopt the KTCA as its own domestic law. *See* Doc. 35-2 at 11–12 (Gaming Compact § 3(D)). Here's the relevant provision:

> **(D)  Tort Remedies for Patrons.**  Tort claims arising from alleged injuries to patrons of the Tribe's gaming facilities shall be subject to disposition *as if the Tribe was the State*, pursuant to the Kansas Tort Claims Act, K.S.A. 75-6101, et seq., as amended hereafter, which is *hereby adopted by the Tribe* in its entirety for this specific purpose only[.]

*Id.* (emphasis added). The emphasized portions of this provision say that the Tribe "adopted" the KTCA "as if the Tribe was the State[.]" *Id.* These parts of the Gaming Compact suggest that the Tribe has opened itself to suit under the KTCA because it has incorporated the KTCA as its own law.[8]

_____

[8]    The court properly may consider the Gaming Compact, which the Tribe attached to its motion-to-dismiss brief. *See* Doc. 35-2. Two bases support this conclusion. *First*, the Complaint cites the Compact as the reason that the Tribe is subject to suit. Doc. 1 at 6 (Compl. ¶ 38). In that regard, it's "'central to the plaintiff's claim and the parties do not dispute the documents' authenticity[,]'" so the court may consider it. *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). *Second*, the court can judicially notice the Gaming Compact because it's a public record. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record." (quotation cleaned up)); *see also* Kansas State Gaming Agency, *Tribal State Compacts and Technical Standards*, https://www.kansas.gov/ksga/Compacts.htm (last visited June 24, 2025) (showing same document that the Tribe attached to its brief).

They don't suggest—as plaintiff's argument implies—that plaintiff bringing his claims in tribal court would require the Tribe to adjudicate state-law claims. Once more, the Tribe's code corroborates this reading. *See* Potawatomi Law and Code § 2-1-3(C) ("Under the Nation's Gaming Compact with the State of Kansas, the Nation has adopted and will apply in its Tribal Court the Kansas Tort Claims Act for patron claims . . . . For claims arising from or related to the Nation's gaming facilities or activities, the Nation shall exercise exclusive jurisdiction for both Indian and non-Indians."). In short, plaintiff's KTCA claims against the Tribe wouldn't require the Tribe's courts to adjudicate abstract state-law claims. Instead, Tribal courts would adjudicate claims under the Tribe's domestic law.

In the end, plaintiff's argument that the Tribe lacks jurisdiction to hear his claim amounts to little more than a bald assertion. And as our Circuit has explained, "speculative futility is not enough to justify federal jurisdiction. The [plaintiff] cannot simply assert that it is not subject to tribal court jurisdiction; rather, it must actually seek adjudication of this issue in tribal court." *Bank of Okla. v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1170 (10th Cir. 1992) (quotation cleaned up). Once more, the court needn't hold definitively that the Tribe has jurisdiction to hear plaintiff's claims against it. The court's task at this juncture is easier. It must only determine that the Tribe's jurisdiction is colorable. After all, the whole point of requiring exhaustion of tribal remedies is that the Tribe should get the first crack at the bounds of its immunity and jurisdiction. *See Nat'l Farmers*, 471 U.S. at 855–56 (instructing that "the answer to the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians . . . . should be conducted in the first instance in the Tribal Court itself"). Plaintiff thus must exhaust his tribal remedies before he may sue in this court.[9]

---

[9]    Because the court dismisses plaintiff's claims against the Tribe for failing to exhaust tribal remedies, the court needn't reach the Tribe's other motion-to-dismiss arguments.

### 3. Stay or Dismiss

Having resolved that issue, the court must decide whether to dismiss plaintiff's claims against the Tribe without prejudice or stay the case. *See Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1241 (10th Cir. 2014) ("A court has the discretion to either dismiss or stay proceedings in such matters pending tribal court exhaustion." (internal quotation marks and citation omitted)); *see also* Restatement of the Law of American Indians § 59 (instructing that courts "must stay proceedings or dismiss them without prejudice" when plaintiff hasn't exhausted tribal remedies).[10] Here, the court opts for dismissal. Other claims and other defendants survive this Order, *see* Doc. 59, so staying the case unnecessarily would slow a final adjudication in this matter. *See* Fed. R. Civ. P. 1. The court thus dismisses plaintiff's claims against the Tribe without prejudice.[11]

### C. Motion for Oral Argument

The Tribe also requested oral argument on its motion. Doc. 35-4 at 1–2. Our local rule, D. Kan. Rule 7.2, gives the court discretion, providing that it "*may* set any motion for oral argument or hearing at the request of a party or on its own initiative." (emphasis added). The

---

[10]    In *Thlopthlocco*, the Circuit ordered a stay—rather than dismissal. 762 F.3d at 1241. It did so under the unique circumstances of that case. *See id.*; *see also Channing v. Seneca-Cayuga Nation*, No. 23-cv-00458-SH, 2024 WL 4271569, at *8 (N.D. Okla. Sept. 23, 2024) (explaining that in *Thlopthlocco*, "an adverse result in the tribal forum could result in depriving the interested parties of their ability even to return to federal court"). *Thlopthlocco* didn't mandate categorically that courts stay—rather than dismiss—cases after finding that the plaintiff failed to exhaust administrative remedies. *See* 762 F.3d at 1241. And subsequently, the Circuit has remanded and instructed the district court to dismiss a case without prejudice after finding a failure to exhaust administrative remedies. *Becker v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 11 F.4th 1140, 1150 (10th Cir. 2021). In short, *Thlopthlocco* doesn't require the court to stay proceedings here.

[11]    Because the court grants the Tribe's Motion to Dismiss, plaintiff's Motion to Strike (Doc. 46) is moot. Plaintiff's Motion to Strike asks the court to strike the United States's effort to substitute itself for the Tribe under the Westfall Act. *See* Doc. 46. Because this Order dismisses all claims against the Tribe, that substitution effort is moot, and in turn, plaintiff's effort to strike it is moot. The court thus denies plaintiff's Motion to Strike (Doc. 46) as moot.

court denies the Tribe's request for oral argument. The parties' papers provided adequate opportunity to argue the issues raised by the Tribe's motion. Oral argument isn't necessary or consistent with Fed. R. Civ. P. 1.

**V.    Conclusion**

To recap, the court grants in part and denies in part the Tribal officers' Motion for Judgment on the Pleadings, Construed as a Motion to Dismiss (Doc. 32). It grants the Tribe's Motion to Dismiss (Doc. 34) in full but denies the Tribe's request for oral argument. Finally, the court denies plaintiff's Motion to Strike (Doc. 46) as moot.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Tanner Lemery, Derek Tuck, and Terry Clark's Motion for Judgment on the Pleadings, Construed as a Motion to Dismiss (Doc. 32) is granted in part and denied in part, as set forth in this Order.

**IT IS FURTHER ORDERED THAT** defendant the Prairie Band Potawatomi Nation's Motion to Dismiss (Doc. 34) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff Dason Musick's Motion to Strike (Doc. 46) is denied as moot.

**IT IS SO ORDERED.**

**Dated this 16th day of July 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
